NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-12030

COMMONWEALTH  vs.  LEEANNE CHESKO.


Worcester.     February 14, 2020. – November 30, 2020.

Present:  Gants, C.J., Lenk, Budd, Cypher, & Kafker, JJ.[1]


Homicide.  Felony-Murder Rule.  Robbery.  Cellular
     Telephone.  Evidence, Medical record, Privileged record,
     Communication between patient and psychotherapist, State of
     mind, Hearsay, Inference.  Practice, Criminal, Instructions
     to jury, Assistance of counsel, Capital case.



Indictment found and returned in the Superior Court
Department on September 23, 2011.

The case was tried before Richard T. Tucker, J.


Richard L. Goldman for the defendant.
Nathaniel R. Beaudoin, Assistant District Attorney, for the
Commonwealth.


CYPHER, J.  A jury convicted the defendant, LeeAnne Chesko,

of murder in the first degree on the theory of felony-murder,

_____

[1] Chief Justice Gants participated in the deliberation on
this case prior to his death.

with armed robbery as the predicate felony, after the victim, Francis P. Spokis, was found dead in his home.[2] The defendant argues on appeal that the judge's failure to instruct on felony-murder in the second degree, the admission of the defendant's cell site location information (CSLI), and the judge's instruction on inferences each resulted in a substantial likelihood of a miscarriage of justice. She further argues that it was prejudicial error for the judge to fail to admit a medical report in evidence and for the judge to restrict the defendant's cross-examination of a witness. The defendant also maintains that trial counsel provided ineffective assistance. In addition, she urges this court to exercise its authority under G. L. c. 278, § 33E, to reduce her verdict or order a new trial. We affirm the defendant's conviction. After a thorough review of the record, we also decline to exercise our authority under G. L. c. 278, § 33E.

Background. We summarize the facts that the jury could have found at trial, reserving certain details for our discussion of the legal issues.

1. Commonwealth's evidence. Sometime around June to July 2011, the defendant and her boyfriend, James Rutherford, came up

---

[2] Indictments charging the defendant with armed robbery, home invasion, and aggravated assault and battery by means of a dangerous weapon were nol prossed before jury empanelment.

with a plan to rob the victim, who lived in Rutland.[3] The victim and the defendant had an ongoing relationship, in which he provided the defendant with drugs or money in exchange for sexual favors. In the spring of 2011, the victim sold a parcel of land located behind an auto body shop that he owned on Franklin Street in Worcester, for $300,000. The sale was published in a local newspaper. Testimony showed that the defendant and Rutherford planned to rob the victim in early July while his wife and child were away on vacation. They had to abandon their first attempt, only to return two days later to carry out the robbery.

At the time, Rutherford lived in Worcester, and his former roommate, Rody Zapata, who testified under a cooperation agreement with the Commonwealth, presented the details of the first attempt at the robbery. On multiple occasions during June and July 2011, Rutherford described a robbery plan to Zapata.[4] The defendant took part in three or four of these conversations.

_____

[3] James Rutherford was convicted in a separate trial of murder in the first degree on the theories of deliberate premeditation and felony-murder, and his conviction was affirmed on appeal. Commonwealth v. Rutherford, 476 Mass. 639, 640 (2017).

[4] This testimony was bolstered by the testimony of two acquaintances of the defendant. One testified that on July 1, 2011, the defendant asked him to help her commit a robbery with Rutherford, and the other testified that about ten days before the murder, the defendant told him that she knew someone with a lot of money whom she wanted to rob.

She knew the person who would be robbed, but did not want that person to know she was involved.  Zapata was not told who the victim was going to be, but was told that the victim owned a business on Franklin Street in Worcester and that he had money.

The plan was for the defendant to get high with the victim. She would leave a door to the house open and notify Rutherford and Zapata when to enter.  Rutherford and Zapata would tie up the victim and the defendant to make it seem that the defendant was not involved in the robbery, and then they would drive the victim to his auto body shop, which they would rob.

On July 4, 2011, Zapata, the defendant, and Rutherford headed to the victim's home at around 11 A.M. to commit the robbery.  After the defendant was not able to reach the victim on his cellular telephone (cell phone), they drove to Rutherford's mother's house to borrow her cell phone.[5]  The three then drove to the victim's house.  Rutherford parked the car on the side of the road and got out of the car to check out the house.  Zapata testified that while he and the defendant were alone in the car, she told him that if the victim discovered that she was involved in the crime, they would have to "get rid

_____

[5] On July 4, 2011, there were multiple calls during the time frame of the planned robbery from the defendant's cell phone to the victim's cell phone.  The Commonwealth presented CSLI of these cell phone calls.  The Commonwealth also presented evidence that a call was placed from Rutherford's mother's cell phone to the victim's cell phone on July 4, 2011, at 2:52 P.M.

of him; kill him." Rutherford returned to the car, and the three drove to return Rutherford's mother's cell phone. The three then drove back to the victim's house, and Rutherford parked the car in a nearby parking area. Zapata and Rutherford got out of the car, but Zapata angered the defendant when he no longer wanted to participate because Rutherford "started pulling out knives." The defendant and Rutherford did not go forward with their plan at that time.

On or about July 5, 2011, Rutherford visited his friend, Luz Hernandez, at her apartment in Worcester. He asked her if he could use the storage unit on her back porch for the purpose of storing stolen items from a robbery he planned to commit. He told Hernandez that he planned to commit the robbery the following day while the victim's family was away on vacation and that a friend might help him commit the crime. Hernandez gave Rutherford a key to the storage unit.

Zapata testified that a "couple days after" July 4, 2011, Rutherford told him that he committed the robbery and "offed" the victim.

Evidence at trial supported that the victim's murder occurred between July 5 and July 6, 2011. On July 5, 2011, Rutherford first went to his mother's house in the afternoon to borrow duct tape, and he returned that evening with the defendant. At around 10 P.M. on July 5, 2011, surveillance

video from a convenience store in Holden showed the defendant and Rutherford drive into the store's parking lot. The video showed the defendant leave the car and walk toward where the pay telephone was located on the property, and then return to the car. Evidence showed that the victim's cell phone received three calls from the store's pay telephone at around 10 P.M.

Hernandez testified that on the afternoon of July 6, 2011, Rutherford called her from the defendant's cell phone to tell her that he was at her apartment. Hernandez returned to her apartment and saw the defendant sitting in the front passenger's seat of a car while Rutherford brought items from the car to Hernandez's storage unit. In the subsequent days, Rutherford brought items to Hernandez's home, including a television stolen from the victim that Hernandez had agreed to purchase for $500.

On the afternoon of July 10, 2011, the victim's wife and child returned home from vacation. The victim's wife had not spoken to the victim during her vacation. When she arrived home, she observed multiple days of mail in the mailbox, four days of newspapers on the ground in the driveway, missing items, and reddish-brown stains on the kitchen floor. She contacted the police. Included among the noticed missing items was a television, a video game system, a computer, and jewelry. The victim's gun safe was open, and there was blood in front of the safe. In the kitchen, officers observed the words "don't do

drugs" written in black marker on the tablecloth and on the countertop and they found a "black Sharpie pen" and cap on the kitchen floor. Blood stains were found in various rooms of the house, and bloody footprints led down the basement stairs. The victim was discovered, dead, at the bottom of the basement stairs. On the floor near the victim, officers found a comforter with blood stains on it and pieces of duct tape. The medical examiner testified that the victim suffered multiple stab wounds, abrasions, and lacerations, and a skull fracture. He further testified that the victim's principal cause of death was blood loss.

The Commonwealth presented testimony that red-brown footprints observed throughout the victim's home were made by women's size seven Converse shoes and men's size eleven Viking boots, consistent with shoes that were worn by the defendant and by Rutherford, respectively.

When searching Hernandez's apartment, police discovered multiple items that matched items stolen from the victim's house, including two televisions, a video game console, rifles, and various personal items. Inside Hernandez's storage unit, officers found firearms, ammunition, items of clothing, and a pair of men's size eleven Viking boots and a pair of women's size seven Converse sneakers. When police took Rutherford into custody on July 13, 2011, officers found keys that opened the

lock on Hernandez's storage unit, and an ammunition canister with what appeared to be bloody palm prints in Rutherford's car. Deoxyribonucleic acid on the ammunition canister matched the victim.

The Commonwealth also presented telephone call records and CSLI evidence. The records showed that although between July 1 and July 6, 2011, the defendant's cell phone was used to call the victim's cell phone multiple times each day, there were no calls to the victim's cell phone after July 6, 2011. The defendant's cell phone account was terminated on July 10, 2011. The CSLI for the defendant's cell phone showed, in part, that on July 4 and July 5, 2011, her cell phone moved from Worcester to Holden and back to Worcester on both days.

2. <u>Defendant's evidence</u>. The defendant called expert Dr. Roger Gray to testify about Zapata's mental health. Gray reviewed Zapata's medical evaluation dated October 1, 2011, opining that the information in the record was consistent with the diagnosis of schizoaffective disorder.

Through the testimony of a forensic document examiner, the defendant also sought to demonstrate that she did not write "don't do drugs" in the victim's home.[6]

---

[6] The defendant also introduced testimony from a police officer that on the night of June 29, 2011, the officer encountered Rutherford during a periodic check of a parking lot. A patfrisk of Rutherford turned up a pellet gun, black gloves,

Discussion. 1. Felony-murder instruction. The defendant argues that the judge erred by failing to instruct the jury on felony-murder in the second degree based on the predicate felony of armed assault with intent to rob, which carries a maximum sentence of twenty years in prison. See G. L. c. 265, § 18 (b). She was not charged with armed assault with intent to rob. The defendant contends that the lack of instruction on felony-murder in the second degree resulted in a substantial likelihood of a miscarriage of justice. The Commonwealth counters that the defendant did not request such an instruction and agreed at trial with the judge that the instruction was not needed, and argues that no rational view of the evidence supported an instruction on armed assault with intent to rob. We conclude that the judge did not err in not providing an instruction on felony-murder in the second degree and therefore no substantial likelihood of a miscarriage of justice occurred.

As an initial matter, when discussing whether to provide an instruction on felony-murder in the second degree during the final charge conference, the judge stated that he did not think the instruction applied at all, and the defendant agreed. The judge next stated, "I couldn't even come up with what the underlying felony would be that was distinct and separate from

_____

and a "large knife." Rutherford had the defendant's pocketbook in his possession, but the defendant was not present.

the actions . . . that resulted in the death of [the victim]."
The defendant did not disagree.  "[W]here the felony later
advanced by a defendant as the predicate for an instruction on
felony-murder in the second degree is not itself the subject of
a separate indictment, no error occurs if the trial judge does
not charge the jury on it even though there may be sufficient
evidence supporting such a charge -- at least where, as here, no
party requested such an instruction or even brought the issue to
the judge's attention at trial."  Commonwealth v. Stokes, 460
Mass. 311, 315 (2011).

Moreover, the judge properly instructed the jury on felony-
murder where "any rational view of the evidence pointed to the
charged crime of armed robbery, and not the lesser crime of
armed assault with intent to rob."  Commonwealth v. Benitez, 464
Mass. 686, 693-694 (2013).  Although, as the defendant argues,
there was evidence presented through Zapata's testimony that the
initial, and unaccomplished, plan was to bring the victim to his
shop in order to rob the safe there, "[w]hat matters is whether
the actual evidence in the case reasonably would support a jury
finding that the lesser predicate felony had been proved, and
not the greater."  Id. at 694 n.12.  See Commonwealth v. Holley,
478 Mass. 508, 528 (2017) (at time of defendant's trial, "an
instruction on felony-murder in the second degree [was]

necessary when there [was] a rational basis in the evidence to warrant the instruction" [quotations and citation omitted]).

To prove the crime of armed robbery in a joint venture, the Commonwealth must prove that the defendant or a coventurer, or both, "(1) was or were armed with a dangerous weapon; (2) either applied actual force or violence to the body of the person identified in the indictment, or by words or gestures put him in fear; (3) took the money or the property of another; and (4) did so with the intent (or sharing the intent) to steal it."  Benitez, 464 Mass. at 690.  To prove the crime of armed assault with intent to rob in a joint venture, the Commonwealth must prove that the defendant or a coventurer, or both, while armed with a dangerous weapon, "assault[ed] a person with a specific or actual intent to rob the person assaulted" (citation omitted).  Id. at 694 n.12.  See G. L. c. 265, § 18 (b).

In the present case, "[n]o reasonable juror would view [the] evidence as supporting a charge of armed assault with intent to rob rather than armed robbery."  Benitez, supra at 694.  The medical examiner testified that the victim's principal cause of death was blood loss and that he suffered multiple stab wounds and other injuries.  The injuries suffered by the victim, along with Zapata's testimony that Rutherford planned to use knives during the July 4, 2011, attempt, satisfy the first two elements of armed robbery.  Id. at 690.  The evidence that

multiple items were removed from the victim's home and found by police at Hernandez's home and in Rutherford's car satisfied the third element of armed robbery. Id. The testimony of Hernandez that Rutherford gave her the television stolen from the victim in exchange for her promise to pay $500 and that she observed Rutherford moving the stolen items to her home from his car, coupled with Zapata's testimony that he, Rutherford, and the defendant planned to split the robbery proceeds three ways, satisfied the fourth element of armed robbery. Id.

If the jury did not believe that the defendant had committed the predicate felony of armed robbery, "they would have found the defendant not guilty; they could not have rationally concluded that [she] was guilty only of armed assault with intent to rob." Id. at 694-695. Therefore, the judge did not err by not providing, sua sponte, an instruction on felony-murder in the second degree, and there was no substantial likelihood of a miscarriage of justice. See Commonwealth v. Silva, 482 Mass. 275, 288 (2019).[7] Moreover, because there

_____

[7] In addition, the jury's questions regarding felony-murder did not, as the defendant argues, further demonstrate that the judge should have instructed on felony-murder in the second degree. The judge provided a sufficient answer to the jury's question. The jury asked (1) whether the second element of felony-murder could be met without the defendant being proved to actually cause the harm, and (2) for clarification on the second element because the instructions did not clearly explain what "knowingly participate" meant. The judge answered in writing: (1) "The force and violence necessary is sufficient if it causes

was no substantial likelihood of a miscarriage of justice, the defendant's claim of ineffective assistance of counsel on this issue also is unsuccessful.  See id. at 288 n.16.

2.  Admission of defendant's historical CSLI records.  The defendant next contends that trial counsel was ineffective for failing to challenge the admission of her historical CSLI[8] and that its admission resulted in a substantial likelihood of a miscarriage of justice.  We agree with the Commonwealth that even if the CSLI should not have been admitted, it was cumulative of other evidence admitted at trial, and therefore, the admission did not result in a substantial likelihood of a miscarriage of justice.[9]  The defendant accordingly also cannot prevail on her claim of ineffective assistance of counsel.

_____

victim to be separated from his property" and (2) "'Knowingly participate' is used in its common meaning, as further refined by the instruction on joint venture."

[8] "[CSLI] 'refers to a cellular telephone service record or records that contain information identifying the base station towers and sectors that receive transmissions from a [cellular] telephone.'"  Commonwealth v. Fulgiam, 477 Mass. 20, 26 n.9, cert. denied, 138 S. Ct. 330 (2017), quoting Commonwealth v. Estabrook, 472 Mass. 852, 853 n.2 (2015).

[9] Because we conclude that the admission of the CSLI did not result in a substantial likelihood of a miscarriage of justice, we need not determine whether, as the defendant argues, the Commonwealth's application for the CSLI failed to meet both the reasonable grounds standard of 18 U.S.C. § 2703(d) and the probable cause standard set forth in Commonwealth v. Augustine, 467 Mass. 230, 255 (2014), S.C. 470 Mass. 837 and 472 Mass. 448 (2015) (Augustine I), which was decided seven months before the defendant's case was tried.  See 18 U.S.C. § 2703(d) (government

In the days following the murder of the victim, the
Commonwealth obtained the defendant's CSLI from June 10, 2011,
to July 14, 2011, pursuant to 18 U.S.C. § 2703(d).  The
defendant's CSLI then was introduced at trial.  To prevail on
her claim that trial counsel provided ineffective assistance by
failing to challenge the CSLI, the defendant must demonstrate
that a challenge would have been successful and that the failure
to bring the challenge resulted in a substantial likelihood of a
miscarriage of justice.  Commonwealth v. Fulgiam, 477 Mass. 20,
29, cert. denied, 138 S. Ct. 330 (2017) (we focus on "whether
there was error and, if so, whether any such error was likely to
have influenced the jury's conclusion" [quotations and citation
omitted]).[10]

---

is required to provide "specific and articulable facts showing
that there are reasonable grounds to believe that the [data]
sought, are relevant and material to an ongoing criminal
investigation"); Fulgiam, supra at 27 (in Augustine I, "we
concluded that government-compelled production of CSLI by
cellular telephone service providers was a search in the
constitutional sense, requiring a warrant under art. 14 of the
Massachusetts Declaration of Rights," but that Augustine I
standard applies only to past records requests if "the defendant
raised the warrant issue before or during the trial and the
defendant's conviction was not final at the time that Augustine
I was decided").

[10] The defendant specifically asserts that the testimony
concerning the CSLI from July 2, 4, 5, and 6, 2011, prejudiced
her, in part because the Commonwealth referred to the CSLI from
these dates in closing argument.

Although the CSLI from July 4, 2011, showed the defendant's cell phone moving from Worcester to Holden and back to Worcester, other evidence also showed that the three were together and in the vicinity of the victim's home in Rutland on that day:  Zapata's testimony; Rutherford's mother, who lived in and was in Rutland at the time, testified that Rutherford borrowed her cell phone that day at some point between 1 P.M. and 2 P.M. and did not return it until after 5 P.M; Rutherford's mother's cell phone was used to place a call to the victim at 2:52 P.M.; and Rutherford's stepfather testified that he observed Zapata lying down on the back seat of Rutherford's car when the three were trying to get his mother's cell phone.  And to the extent that the CSLI from July 5, 2011, also showed the defendant moving from Worcester to Holden and back to Worcester, and showed her cell phone in the vicinity of the convenience store near the time that calls were placed from the store's pay telephone, the surveillance video and the call record of the convenience store's pay telephone also showed this.

In addition, the jury had other evidence before them regarding the defendant's involvement in the victim's murder, including the relationship between the defendant and victim and the knowledge she gained from the relationship; Zapata's testimony about the plan; the defendant's telling two other acquaintances that she planned to rob someone; and that the

bloody footprints matched the shoes that were worn by the defendant.

3. Denial of motion to admit privileged psychiatric records. The defendant next argues that the judge abused his discretion in denying the defendant's motion to admit a two-page psychiatric report on Zapata, resulting in prejudicial error. We conclude that the judge was within his discretion in denying the defendant's motion.

"All communications between a licensed psychologist and the individuals with whom the psychologist engages in the practice of psychology are confidential." G. L. c. 112, § 129A. See G. L. c. 233, § 20B. To gain initial access to a privileged document, counsel must first meet particular requirements. See Commonwealth v. Dwyer, 448 Mass. 122, 147-149 (2006) (Appendix) (describing protocols); Commonwealth v. Lampron, 441 Mass. 265, 268 (2004). Insofar as relevant here, a party must first file a motion for the documents under Mass. R. Crim. P. 17 (a) (2), 378 Mass. 885 (1979), and a hearing is held to determine whether the requested documents are presumptively privileged. See Mass. G. Evid. § 1108 (2020). Before any final pretrial conference, the defendant must then file a motion in limine in order to be able to use the presumptively privileged documents at trial. See Dwyer, supra at 150; Mass. G. Evid. § 1108(g). We review a judge's evidentiary ruling for an abuse of

discretion.  See <u>Commonwealth</u> v. <u>Andre</u>, 484 Mass. 403, 414 (2020).

The defendant here filed a motion before trial under the <u>Dwyer</u> protocol, requesting to be provided with Zapata's records from June 1, 2011, to August 30, 2011.  The motion was granted, and the judge noted that the records presumptively were privileged.  The defendant did not file a pretrial motion in limine to use the subject records at trial.  See <u>Dwyer</u>, 448 Mass. at 150.  During Zapata's trial testimony, the defendant orally moved to admit Zapata's psychiatric records in evidence, and the judge denied the motion.[11]

The judge stated in his memorandum of decision that he denied the motion because the records presumptively were privileged; the defendant did not comply with <u>Dwyer</u> protocols; the opinion contained in the record should have been presented through the medical provider who created the document; and it was improper to allow the medical provider's expert opinion to be before the jury in written form without the Commonwealth having an opportunity to cross-examine her.  The judge further explained that the defendant had received the benefit of the <u>Lampron</u>-<u>Dwyer</u> protocol and the "functional equivalent of the

---

[11] After the jury began deliberating, the defendant filed a motion for reconsideration of the judge's refusal to admit Zapata's medical records, which the judge also denied.

record's admission as an exhibit" because the defendant had had access to and use of the records; she was granted permission to have her expert review the records to formulate his assessment of Zapata, and Zapata himself had testified to "much of the report's content"; and he would remain on the witness stand for the remainder of his cross-examination by the defendant. In addition, Zapata testified on direct and cross-examination regarding the content of the records, and the defendant's expert witness opined that based on the records he had reviewed, he agreed with the author that the defendant had schizoaffective disorder. The judge acted within his discretion to deny the defendant's motion.

We also conclude that counsel's failure to move pretrial to admit the report did not, as the defendant argues, result in ineffective assistance of counsel. See Commonwealth v. Lee, 483 Mass. 531, 544 (2019). The judge did not deny the defendant's motion solely on the basis of counsel's failure to follow Dwyer protocols. Instead, the judge also stated in his decision that the medical provider's opinion should have been presented through the testimony of that medical provider. And as explained supra, the defendant received the "functional equivalent of the record's admission."

4. Testimony of Hernandez. The defendant next argues that during the defendant's cross-examination of Hernandez, the judge

should have allowed in evidence statements that Rutherford made to Hernandez about his relationship with the defendant to rebut the Commonwealth's theory that the defendant and Rutherford were close.[12]  We agree with the Commonwealth that the judge correctly prohibited the defendant from eliciting this testimony as hearsay.

The defendant argued that she was not offering the statements for their truth, but rather to show Rutherford's state of mind.  The Commonwealth argued that the statements were hearsay not falling within any exception and that it was not arguing that a joint venture was established because of the close relationship between the defendant and Rutherford.  The judge did not err in excluding the statements because, to the extent that the statements were relevant, Mass. G. Evid. § 401 (2020), they were not being offered for a nonhearsay purpose, Mass. G. Evid. § 801(c)(2), (d)(2)(E), and they did not fall within the state of mind exception to hearsay, Mass. G. Evid. § 803(3).  Therefore, there was no prejudicial error.

5.  <u>Instruction on use of inferences</u>.  The defendant next argues that the judge failed to provide the jury with a clear

_____

[12] The statements the defendant sought to introduce included that Hernandez observed the defendant and Rutherford arguing, that Rutherford needed someone to help pay the rent and that that is why he and the defendant lived together, and that Rutherford did not want to be with the defendant but was doing the right thing because she was pregnant with his child.

instruction on the use of inferences.  In particular, she argues

that the judge erred by failing to instruct that a "conviction

should not be based upon the piling of inferences."  We agree

with the Commonwealth that the judge gave a proper jury

instruction.

The judge instructed the jury, in part:

"The word 'infer,' or the expression, 'to draw an
inference,' means to find that a fact exists based on the
proof of another fact or set of facts. . . .  An inference
may be drawn, however, only if it is reasonable and
logical, and not if it is speculative. . . .  In deciding
whether to draw an inference, you must look at and consider
all of the facts in the case in the light of reason, common
sense, and your own life experience."

The judge also provided two scenarios from an example of

everyday life to illustrate the concept.[13]  When instructing the

jury on joint venture, the judge stated, in part:  "The

inferences you draw must be reasonable, and you may rely on your

experience and common sense in determining the defendant's

knowledge and intent."  The judge further instructed that the

Commonwealth bore the burden of proving the defendant's guilt

beyond a reasonable doubt.  The defendant did not object to the

lack of an instruction on the piling of inferences, and we

_____

[13] The scenarios were:  (1) if puddles are seen on the
ground in the morning, it can be inferred rain fell during the
night, even though the day is bright and clear, but (2) an
inference may be drawn only if it is reasonable and logical, and
not speculative, so if the puddles are only on your street and
not on other streets in your neighborhood, a broken water main
or sprinkler may explain the water.

therefore review for whether, if there was error, the error created a substantial likelihood of a miscarriage of justice.

Although the instructions do not track with precision the Criminal Model Jury Instructions for Use in the District Court (2009) (model instructions), they provided an "adequate and clear instruction[] on the applicable law," Commonwealth v. Roberts, 378 Mass. 116, 130 (1979), S.C., 423 Mass. 17 (1996), and neither the model instructions nor the supplemental instructions contain language about the piling of inferences. See Instruction 3.100 of the Criminal Model Jury Instructions for Use in the District Court. See also Commonwealth v. Alleyne, 474 Mass. 771, 785 (2016) (as long as legal concepts were properly explained in jury instruction, judge need not use particular words); Instruction 2.240 of the Criminal Model Jury Instructions for Use in the District Court. Moreover, the cases cited as support by the defendant, see Commonwealth v. Gonzalez, 475 Mass. 396, 407 (2016); Commonwealth v. Mandile, 403 Mass. 93, 94 (1988), do not require that the suggested language be included in a jury instruction. Gonzalez and Mandile both state that a conviction may not rest upon "the piling of inference upon inference or conjecture and speculation," but in both cases the court was addressing the sufficiency of the evidence, not the proper jury instruction. See Gonzalez, supra at 407; Mandile, supra at 94. In addition, the example that the

judge used to illustrate the concept of inferences, see note 13, supra, did not "permit the drawing of remote or speculative inferences from assumed facts [or] the piling of inference upon inference."  See Commonwealth v. Gonzalez, 28 Mass. App. Ct. 906, 907 (1989).  See also Silva, 482 Mass. at 290, quoting Commonwealth v. Shea, 398 Mass. 264, 271 (1986) ("The use of an illustration to explain an inference in connection with the concept of circumstantial evidence is permissible").  Therefore, the judge did not err in instructing the jury on the use of inferences and no substantial likelihood of a miscarriage of justice occurred.  See Commonwealth v. AdonSoto, 475 Mass. 497, 510-511 (2016).

6.  Review under G. L. c. 278, § 33E.  After a thorough review of the record, we do not find reason to exercise our authority under G. L. c. 278, § 33E, to reduce the defendant's verdict or order a new trial.  The defendant focuses her § 33E argument on the judge's felony-murder instruction and Commonwealth v. Brown, 477 Mass. 805, 823 (2017), cert. denied, 139 S. Ct. 54 (2018), arguing that the judge's instruction on felony-murder combined with the jury's questions cast doubt on the justice of the verdict.  She further argues that the defendant's conviction "rests on two pillars rejected in Brown:  (1) vicarious criminal liability for acts committed by joint venturers; and (2) imposition of a conclusive

presumption of malice from the intent to commit an inherently dangerous predicate felony."  See id. at 829 (Gants, C.J., concurring).  We concluded supra that the judge did not err in instructing the jury on felony-murder and that he provided adequate answers to the jury's questions.  In addition, as recognized by the defendant, the holding in Brown was prospective.  Id. at 834 (Gants, C.J., concurring).  See Commonwealth v. Martin, 484 Mass. 634, 645 (2020).  Therefore, we decline to exercise our authority under § 33E to reduce the defendant's verdict or order a new trial.

So ordered.