NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-08733

COMMONWEALTH  vs.  SHANE MOFFAT.


Hampden.     May 8, 2020. - November 12, 2020.

Present:  Gants, C.J., Lenk, Gaziano, Lowy, & Budd, JJ.[1]


Homicide.  Evidence, Exculpatory, Opinion.  Practice, Criminal,
    Discovery, Argument by prosecutor, Instructions to jury,
    Assistance of counsel, Capital case.



    Indictment found and returned in the Superior Court
Department on February 17, 2000.

    The case was tried before Tina S. Page, J.; motions for
postconviction discovery and for a new trial were considered by
her; and following review by this court, 478 Mass. 292 (2017), a
second motion for postconviction discovery was considered by
David Ricciardone, J., and a motion for reconsideration was
considered by Page, J.


    Merritt Schnipper for the defendant.
    Cynthia Cullen Payne, Assistant District Attorney, for the
Commonwealth.


_____

    [1] Chief Justice Gants participated in the deliberation on
this case prior to his death.

LOWY, J.  In October 2001, a jury convicted the defendant, Shane Moffat, of murder in the first degree for the shooting death of Malcolm Howard.[2]  The defendant seeks reversal of his conviction, arguing that (1) the Commonwealth violated the defendant's due process rights by failing to investigate evidence that contradicted its trial theory and by presenting a trial theory that it knew or had reason to know was false; (2) two lay witnesses improperly testified as to the defendant's guilt without personal knowledge, violating the defendant's due process rights; (3) during closing argument, the prosecutor improperly urged the jury to draw an inference of guilt against the defendant due to his court room behavior; (4) the trial judge erred by providing incomplete jury instructions regarding circumstantial evidence; (5) trial counsel provided ineffective assistance for various reasons, including by failing to investigate third-party culprit evidence; and (6) the motion judges erred in denying the defendant's motions for postconviction discovery.  The defendant also requests that we exercise our power pursuant to G. L. c. 278, § 33E, to grant him a new trial.  Finding neither reversible error nor reason to exercise our authority under § 33E, we affirm.

---

[2] The judge sentenced the defendant to life in prison.

Background.  "We recite the evidence in the light most favorable to the Commonwealth, reserving certain details for later discussion."  Commonwealth v. Tavares, 484 Mass. 650, 651 (2020).

1.  The murder and aftermath.  During a meeting on May 10, 1999, the defendant offered to procure cocaine for the victim and the victim's cousin, George Marshall.  Three days later, the victim's girlfriend gave the victim $1,300 to purchase drugs from the defendant.  Later that day, at around 11 A.M., Marshall drove the victim to meet the defendant in Marshall's fiancée's car, which was a Toyota.  The defendant told Marshall that the defendant and the victim had to meet the cocaine distributor elsewhere, and that Marshall could not come.  Marshall let the victim borrow the Toyota, and the victim agreed that he would return in time for Marshall to be able to pick up his daughter later that afternoon.  The victim drove away with the defendant at around 1:30 P.M.

The victim first drove the defendant to the defendant's mother's house, where the defendant retrieved his mail.  The victim then drove the defendant to Fred Jackson Road in Southwick, and shortly thereafter, the victim was shot with a shotgun.  At 3:11 P.M., the defendant used the victim's cell phone to place a call.  The cell phone signal from that call

corresponded with a cell tower within three to five miles of Fred Jackson Road.

After the victim did not return with the Toyota by the promised time, Marshall attempted to contact both the victim and the defendant. The defendant told Marshall that the defendant had not seen or heard from the victim since earlier that day when the victim had dropped off the defendant. Later that night, Marshall and the victim's girlfriend confronted the defendant about the victim's whereabouts, and the defendant again denied any knowledge.

That same evening, the defendant and his friend, Jarod Thompson, took a taxicab to various locations, including one location where the defendant and Thompson disposed of a shotgun barrel in a storm drain. During the ride, the defendant showed Thompson a shirt with blood on it. The defendant also left a bag in the taxicab, which contained the boots the defendant was wearing during the murder.

2. The investigation. On May 16, 1999, a man discovered the victim's body lying on the side of an embankment on Fred Jackson Road.[3] An autopsy later revealed that the victim's cause of death was a close range shotgun wound to his neck. On May 18, 1999, the Toyota was discovered outside an abandoned

---

[3] The victim was still wearing his jewelry, but there was no wallet or identification on him.

factory, and the driver's seat was soaked with blood.  Officers recovered the victim's baseball cap from the brush next to the Toyota and the defendant's mail, which bore his mother's address, from the front passenger seat.

The police later recovered from the storm drain the shotgun barrel, which was consistent with the type of shotgun used to murder the victim.  The police also recovered from the taxicab a bag containing the defendant's boots and later determined that the victim's deoxyribonucleic acid was on the defendant's right boot.

3.  Arrest and police interviews.  On May 21, 1999, a warrant issued for the defendant's arrest.  Shortly thereafter, the police went to Thompson's house looking for the defendant, but they did not find him there.[4]  The defendant fled to New York, and then to Florida, where police there arrested him several months later on an unrelated charge.[5]  Over the course of several interviews with the defendant, both in Florida and in

---

[4] At trial, the defendant testified that he knew the police were there, but that he had hidden on the third floor until the police left.

[5] Upon arrest, the defendant identified himself under an alias, Frank Matta, with an address in Seattle, Washington.

Massachusetts, the defendant provided the Massachusetts police officers with three different versions of the murder.[6]

First, the defendant claimed that when he could not reach the cocaine distributor, a man named "Ayah," the victim dropped off the defendant, and the defendant did not see the victim again. Three days after the murder, a girl approached the defendant and handed him a bag containing three shotguns. The defendant gave two away, and because the third smelled like it had just been fired, he dismantled it and disposed of it in the storm drain.

The detectives then informed the defendant that the police had recovered the shotgun barrel and the defendant's boots from the taxicab, and that the police knew the defendant had used the victim's cell phone. The defendant then asked the detectives, "Why would I murder somebody for just thirteen hundred dollars[?]"

In his second version of events, the defendant claimed that he had brought the victim to meet Ayah and someone named Quentin. Upon their arrival, Ayah and Quentin entered the backseat of the Toyota, while the defendant sat in the front passenger's seat, and the victim sat in the driver's seat. As

---

[6] The defendant told the police the first two versions in Florida. The defendant told the police the third version in Massachusetts.

the four men talked, the defendant heard a loud bang and saw the victim slump over the steering wheel.  The defendant then helped remove the victim's body from the car and placed it in the trunk of Ayah and Quentin's car.  The defendant drove the blood-soaked Toyota to Hartford.  He accused Ayah and Quentin of framing him, claiming that Ayah and Quentin both wore surgical gloves, while he did not, and that he had let Ayah borrow his boots.

Following the defendant's second version, the detectives gave the defendant a copy of Thompson's statement and photographs of the shotgun and the taxicab.  The detectives reviewed the evidence against the defendant, and the defendant acknowledged that the police had enough evidence to convict.  The interview was then interrupted, and when it resumed a couple months later, the defendant offered a third version of events.[7]

In this third version, the defendant, Marshall, and the victim met Ayah and Quentin at a convenience store.  The defendant and the victim then followed Ayah and Quentin in the Toyota to a gasoline station and then to Fred Jackson Road, stopping in between to retrieve the defendant's mail from his mother's house.  Once there, Ayah and Quentin got out of their car, and Quentin shot the victim while standing behind the

---

[7] The detectives did not speak to the defendant again until January 2000, when they picked him at the airport in Miami to transport him back to Massachusetts.

driver's side window. Ayah and Quentin then removed the victim's body from the Toyota and dropped him down the embankment. After, Ayah drove the defendant away from the scene in Ayah's car, and Quentin drove the Toyota to Hartford.

As to motive, the defendant offered that the victim was killed because Marshall and the victim had robbed someone in New York City during a drug deal. The defendant admitted that he owned the murder weapon, that he had disposed of it, and that his fingerprints were on it. The defendant then agreed to take police to the murder location. Once at the murder site on Fred Jackson Road, the defendant admitted that he, not Ayah, had been wearing his boots during the murder, but he could not explain how the victim's blood had ended up on them.

4. The trial. During his trial testimony, the defendant acknowledged that he was present during the murder, but he claimed that he did not shoot the victim and that he did not know that Ayah and Quentin had planned to do so. The defendant largely reiterated his third version of events, but he denied that the murder weapon belonged to him. On October 11, 2001, the jury convicted the defendant of murder in the first degree on the theories of felony-murder and deliberate premeditation. The defendant was sentenced and filed a notice of appeal the following day. Over the subsequent seventeen years, the

defendant filed multiple postconviction motions.[8]  We

consolidated the defendant's direct appeal from his conviction

of murder in the first degree with his appeals from the denials

of some of those motions.

Discussion.  1.  Commonwealth's improper trial theory.  One

week prior to trial, the Commonwealth received a heavily

redacted Federal Bureau of Investigation (FBI) report from the

United States Attorney's office, which contained a portion of an

FBI interview of someone named Desmond Wolfe from December 9,

1999.  The FBI report, which the defendant possessed prior to

trial, stated:

> "With regards to a murder that occurred in Springfield,
> Screw told Wolfe that he (Screw) and [the defendant] on the
> day of the murder, 'licked a man down and now he died.'
> Screw . . . fled to Florida with [the defendant] and
> telephoned Wolfe from Florida a few times. . . .  Screw
> told Wolfe that the murder victim owed [the defendant]
> money and that he (Screw) witnessed [the defendant] commit
> the murder."[9]

---

[8] We docketed the defendant's direct appeal in 2002 and,
over the subsequent sixteen years, we allowed multiple of the
defendant's motions to stay his direct appeal pending various
other motions in the trial court.

In 2013, the defendant filed a motion for postconviction
testing for four cigarette butts pursuant to G. L. c. 278A,
which the trial judge denied.  The defendant appealed.  We
allowed the defendant's motion to stay his direct appeal, as
well as his motion to proceed with that appeal, and ultimately,
we affirmed the judge's denial on November 6, 2017.  See
Commonwealth v. Moffat, 478 Mass. 292 (2017).

[9] "Screw" refers to the defendant's sister's partner, Everol
Bartlett.  Wolfe was also known as Horace Richards.  In

The Commonwealth's theory at trial was that the defendant acted alone. Conversely, the defendant's theory was that the defendant was present, but that Ayah and Quentin jointly murdered the victim without informing the defendant of their intent to do so. The defendant did not mention Screw at trial, or in any of the three versions of events he told the police.

On appeal, however, the defendant argues that the Commonwealth improperly failed to investigate the allegations contained in the FBI report that the defendant was not alone at the time of the murder, and the Commonwealth knew or should have known that its theory that the defendant acted alone was false or misleading. The defendant contends that those errors violated his due process rights and entitle him to a new trial.

a. Failure to investigate. The Commonwealth had no obligation to investigate the FBI report. "While the prosecution remains obligated to disclose all exculpatory evidence in its possession, it is under no duty to gather evidence" or to conduct further investigation "that may be potentially helpful to the defense." Commonwealth v. Wright, 479 Mass. 124, 140 (2018), quoting Commonwealth v. Lapage, 435

_____

addition, according to the defendant's brother's statement to police, the defendant told his brother about Screw's involvement in the murder in June 1999, which was several months before the defendant first spoke to the police and before the FBI interviewed Wolfe.

Mass. 480, 488 (2001). As quoted above, the FBI report references that Screw told Wolfe that the defendant shot the victim, and that Screw witnessed the murder. Nonetheless, assuming, without deciding, that the FBI report constitutes exculpatory evidence, the prosecutor satisfied his legal duty by providing the report to the defense prior to trial.

b. False or misleading theory. "There is no doubt that the defendant would be entitled to relief if the prosecution 'deliberately presented a false picture of the facts, either by knowingly using perjured testimony, failing to correct testimony when it became apparent that it was false, or actively suppressing evidence known to be exculpatory'" (citation omitted). Commonwealth v. Earl, 362 Mass. 11, 15 n.4 (1972). Here, however, the Commonwealth did not present or fail to correct any false testimony.

So long as the prosecutor abides by his or her duty to provide the defendant with any material, exculpatory information within the Commonwealth's possession or control, see Commonwealth v. Ayala, 481 Mass. 46, 56 (2018), nothing requires the prosecutor to present that evidence to the jury. Contrary to the defendant's assertion, omitting evidence that helps the defendant and that counters the prosecutor's theory of the case does not equate to presenting or failing to correct false testimony. See Commonwealth v. Jewett, 442 Mass. 356, 363

(2004) ("It was not the prosecutor's duty to try the defendant's case for him by attempting to impeach the testimony of the Commonwealth's own witnesses with cryptic and inconclusive documents in the defense counsel's possession").  The prosecutor satisfied his legal obligation.

2.  Lay witness testimony.  During trial, the Commonwealth called Marshall and Marshall's fiancée, Nicole Wilson, to testify as to their encounters with the victim and defendant at around the time of the murder.  The defendant argues that several statements made by these witnesses lacked personal knowledge and improperly commented on the defendant's guilt; thus, the testimony prejudicially encroached on the jury's fact-finding duty and violated the defendant's due process rights.

a.  Personal knowledge.  During trial, both Marshall and Wilson testified that the defendant was the last person with the victim.  Marshall first testified that on the day the victim went missing, he had repeatedly called and paged the defendant because the defendant "was the last one with my cousin."  Marshall also testified that he brought the defendant over to speak to the victim's girlfriend, telling her "this is the last guy that was with [the victim]."  Later, Wilson testified that she "knew [the defendant] was the last person with [the victim]."  Specifically, the defendant argues that through these

statements, the witnesses testified, without personal knowledge, that the defendant was the last person to see the victim alive.

Lay witnesses may only testify regarding matters within their personal knowledge.  See Commonwealth v. Irene, 462 Mass. 600, 606, cert. denied, 568 U.S. 968 (2012); Mass. G. Evid. § 602 (2020).  Viewed in the context of Marshall's entire testimony, however, Marshall's first statement was part of his explanation as to why he repeatedly called the defendant after the victim did not return the Toyota -- because the defendant was the last person Marshall saw with the defendant.  Marshall's second contested statement and Wilson's contested statement were part of their respective explanations as to why Marshall asked the defendant to speak to the victim's girlfriend -- because they sought any additional information about the victim's whereabouts.  Moreover, at the time Marshall tried to contact the defendant, and at the time both Marshall and Wilson ultimately spoke with the defendant, neither Marshall nor Wilson knew the victim had been killed, as the police had not yet discovered his body.  It was therefore clear to the jury that Marshall and Wilson did not have personal knowledge of the events that gave rise to the victim's death.  There was no reversible error.

b.  Culpability.  Marshall also testified that he had previously referred to the defendant as the "guy . . . who

killed my cousin."[10]  This evidence was inadmissible.  See

Commonwealth v. Perez, 460 Mass. 683, 694 (2011) (error to

permit witness to opine as to defendant's culpability).  See

also Mass. G. Evid. § 704 (2020).  However, there was no

substantial likelihood of a miscarriage of justice.  It would

have been obvious to the jury, as well as to all counsel and the

judge, that the witness had no personal knowledge as to who shot

the victim.  The testimony, however, occurred during defense

counsel's cross-examination, and defense counsel neither moved

to strike the answer nor moved to request a curative

instruction.  Considering that the witness's nonresponsive

answer demonstrated the witness's bias against the defendant,

there were strategic reasons for allowing the answer to remain.

We conclude that this inadmissible evidence did not create a

substantial likelihood of a miscarriage of justice.[11]

---

[10] Marshall said this in response to defense counsel's question regarding the content of Marshall's adopted statement made to police.  Specifically, defense counsel asked Marshall to explain what Marshall meant when he told the police that the victim told him "the scoop" about why the victim and the defendant were going to meet the cocaine dealer alone.

[11] As stated, the judge would have recognized that neither Marshall nor Wilson had personal knowledge as to who shot the victim.  It is unrealistic in this context, however, to expect the judge to interrupt counsel during cross-examination merely because the case may one day be reviewed under a substantial likelihood of a miscarriage of justice standard.  There is something to be said for letting lawyers try their cases.

Finally, Marshall's testimony was but one piece of evidence in an otherwise ornate puzzle.  Viewing the evidence in the light most favorable to the Commonwealth, the defendant admitted to being present at the time of the murder, to owning and disposing of the murder weapon, and to using the victim's cell phone after the murder.  The police found the defendant's mail in the Toyota, and the victim's blood was found on the defendant's boots, which the defendant admitted he was wearing during the murder.  As such, we are convinced that "stripping the improper testimony from the other evidence, the judgment was not substantially swayed by the error" (quotation omitted).  Perez, 460 Mass. at 695, quoting Commonwealth v. Lodge, 431 Mass. 461, 468 (2000).

3.  Closing argument.  The defendant next argues that the prosecutor made several improper statements during his closing argument, violating the defendant's due process rights.  Because the defendant did not object at trial, we review any error for a substantial likelihood of a miscarriage of justice.  See Commonwealth v. Andre, 484 Mass. 403, 417 (2020).  We consider statements made during closing argument "in the context of the whole argument, the evidence admitted at trial, and the judge's instructions to the jury."  Commonwealth v. Felder, 455 Mass. 359, 368 (2009).

The defendant argues that the prosecutor improperly invited an inference of guilt based on the defendant's court room behavior. During his closing argument, the prosecutor referred to the defendant's testimony as "stone cold," and given without "emotion" and without "indication of remorse . . . [or] regret." Ultimately, the prosecutor drew a comparison between the defendant's demeanor while testifying and the manner in which the victim was killed: "I purport to you, ladies and gentlemen, no emotion. He was stone cold, just as stone cold as the shooting and the death of [the victim]." These statements were improper. Cf. Commonwealth v. Smith, 387 Mass. 900, 907 (1983) (no error for prosecutor to point out that, as jury observed, defendant, who did not testify, "squirm[ed] and smirk[ed] and laugh[ed]" during trial).

Prosecutors may "properly attack" a testifying defendant's credibility, see Commonwealth v. Donovan, 422 Mass. 349, 357 (1996), and such an attack may include comments on the defendant's demeanor on the witness stand, see Commonwealth v. Kozec, 399 Mass. 514, 521 (1987). Prosecutors may not, however, extrapolate from that demeanor and argue that the jury should then draw an inference as to the defendant's conduct during the

alleged incident.[12]  Here, however, in at least one sentence of the closing, the prosecutor's improper link between the defendant's "stone cold" and emotionless testimony at trial and the "stone cold" nature of the killing went beyond benign comments on the defendant's credibility.  See id. at 523-524 (improper and unfair for prosecutor to draw inference of guilt based on "prosecutor's perception of the defendant's [sorrowful] expression when the victim testified"); Commonwealth v. Borodine, 371 Mass. 1, 9-10 (1976), cert. denied, 429 U.S. 1049 (1977) (error for prosecutor to reference "absence of remorse," as it was both immaterial and inappropriate).  There was no evidence as to the defendant's demeanor when he killed the victim.

Nevertheless, we conclude that the error did not create a substantial likelihood of a miscarriage of justice.  See Commonwealth v. Gardner, 479 Mass. 764, 776 (2018).  The prosecutor's characterizations comprised only two sentences of his thirty-two page closing argument.  Moreover, the judge

---

[12] Prosecutors may comment on a defendant's general appearance in closing, to the extent it is relevant.  See Commonwealth v. Kater, 388 Mass. 519, 532-533, 535 (1983) (permissible to comment on defendant's changed hairstyle between crime and trial, but improper for prosecutor to imply defendant did not wear short-sleeved shirts during trial to try to conceal his hairy arms where witness testified that suspect had hairy arms).  But see Commonwealth v. Young, 399 Mass. 527, 529 (1987) (improper to argue negative inference against defendant "from the fact that he sat quietly throughout the trial").

provided three separate instructions to the jury that closing arguments were not evidence, including a thorough instruction just prior to closing arguments. We must presume the jury understood those instructions. See Andre, 484 Mass. at 418. We conclude that the prosecutor's statements were "unlikely to have influenced the jury's ultimate decision," see Commonwealth v. Salazar, 481 Mass. 105, 118 (2018), especially given the weight of the evidence against the defendant, as described supra.[13]

4. Jury instructions. The defendant next argues that the judge's jury instructions regarding circumstantial evidence and inferences were incomplete,[14] thereby decreasing the

---

[13] The defendant also makes a passing argument that the prosecutor improperly referred to Ayah and Quentin as "mystery men," thereby mocking the defendant's testimony. The defendant testified that while he did not know Ayah and Quentin's last names, he knew how to contact Ayah and he knew the address of the house where he had originally met both Ayah and Quentin. Despite this knowledge, taking the evidence in the light most favorable to the Commonwealth, the defendant did not provide the police with more than their general physical descriptions. The prosecutor's "mystery men" statements were accurate and within the bounds of a proper closing argument.

[14] As to the circumstantial evidence instruction, the defendant contends that the judge should have included language that states that where the Commonwealth's case is based solely on circumstantial evidence, the jury "may find the defendant guilty only if those circumstances are conclusive enough to leave you with a moral certainty -- a subjective state of near certitude -- that the defendant is guilty and that there is no other reasonable explanation of the facts as proven."

As to the inference instruction, the defendant contends that the judge should have included language that states that

Commonwealth's burden of proof.[15] While the language the defendant asserts should have been included comprises accurate statements of the law, we have never said, and we do not now say, that such language is required.

When determining whether a jury instruction "lowers the criminal standard of proof, we consider the charge, taken as a whole, and assess the possible impact of [an] alleged error on the deliberations of a reasonable juror, i.e., whether a reasonable juror could have used the instruction incorrectly" (quotations omitted). Commonwealth v. Silva, 482 Mass. 275, 288 (2019), quoting Commonwealth v. Rosa, 422 Mass. 18, 27 (1996). "This inquiry is not purely speculative but, rather, must be supported by some evidence in the record." Silva, supra. "A judge need not use any particular words in instructing the jury as long as the legal concepts are properly described." Commonwealth v. Robinson, 449 Mass. 1, 8 (2007).

---

"[i]n order to convict the defendant, you must find that all of the evidence and reasonable inferences that you have drawn, taken together, prove he is guilty beyond a reasonable doubt."

[15] In Commonwealth v. Bush, 427 Mass. 26, 32 n.4 (1998), we concluded that the trial judge adequately cured any possible error in the jury instructions by instructing the jury that "[t]he evidence must not only be consistent with the defendant's guilt, it must be inconsistent with his innocence" (citation omitted). To the extent the defendant argues that in purely circumstantial evidence cases such an instruction is mandatory, he is incorrect. The defendant cites to no cases, nor have we found any, in which we held as much.

"Taken as a whole, the judge's instructions on circumstantial evidence and inferences 'correctly stated the relevant principles and essentially cautioned the jury to be sure of the strength and logic of any inferences they drew.'" Silva, 482 Mass. at 290, quoting Commonwealth v. Schand, 420 Mass. 783, 795 (1995). As the defendant concedes, the judge properly defined both direct and circumstantial evidence.[16] The judge then correctly defined the nature of an inference and properly instructed the jury that they "may draw [an] inference even if it is not necessary or inescapable, so long as it is reasonable and warranted by the evidence."[17] See Brown v. Commonwealth, 407 Mass. 84, 89 (1990), S.C., 414 Mass. 123 (1993). See also Commonwealth v. Pires, 389 Mass. 657, 664 (1983) ("nature of an inference . . . [is] a concept intimately related to circumstantial evidence"). Finally, the judge

---

[16] The judge stated as follows:

"Direct evidence is when a witness testifies to something they heard, saw, or somehow sensed. The only question that you must resolve in your mind is whether or not you believe that witness.

"You have circumstantial evidence, where no witness can testify directly about the fact that is to be proven but you are presented with evidence of other facts and then asked to draw reasonable inferences from them about the fact that is to be proved."

[17] Contrary to the defendant's contention otherwise, the judge did instruct the jury "not to decide this case based on suspicion or conjecture."

provided a detailed and proper description of the Commonwealth's burden to prove the elements of the charged offense beyond a reasonable doubt, adhering to the then complete Webster instruction. See Commonwealth v. Webster, 5 Cush. 295, 319-320 (1850), modified by Commonwealth v. Russell, 470 Mass. 464, 477 (2015) (adding definition of "moral certainty" to Webster instruction). There was no error.

5. Ineffective assistance of counsel. The defendant next asserts that he was deprived of effective assistance of counsel because his trial counsel failed to investigate possible third-party culprit evidence. We review claims of ineffective assistance of counsel in cases of murder in the first degree for a substantial likelihood of a miscarriage of justice. See Commonwealth v. Gulla, 476 Mass. 743, 745-746 (2017).

The defendant argues that his trial counsel failed to "make reasonable inquiries" into the allegations contained in the FBI report, which indicated that the defendant was not at the crime scene alone, as well as to investigate the knowledge of the defendant's brother regarding the other potential individuals involved. We conclude that the defendant's trial counsel did not provide ineffective assistance.[18]

---

[18] The defendant also filed a motion for a new trial on similar grounds, which the trial judge denied. As discussed infra, the defendant did not raise the denial of that motion in his appeal.

Contrary to the defendant's contention that his trial counsel "did nothing," the record indicates that the defendant's investigator followed up on the FBI report both before and during trial. The defendant has failed to present evidence as to how further investigation into a largely inculpatory document "might have accomplished something material for the defense."[19] Commonwealth v. Satterfield, 373 Mass. 109, 115 (1977). Regarding the possibly helpful testimony of the defendant's brother, the defendant cites to a police report, which contains a summary of the police's interview with the defendant's brother. In that police report, however, the author explicitly states that the knowledge of the defendant's brother regarding the murder is based solely on what the defendant previously told his brother. Moreover, the defendant fails to assert how trial counsel's failure to elicit the testimony of the defendant's brother regarding his knowledge of other potentially involved individuals created a substantial likelihood of a miscarriage of justice.

Trial counsel presented a complete and thorough defense, contending that Ayah and Quentin, not the defendant, committed

---

[19] By way of example only, the defendant has never submitted an affidavit from Wolfe's counsel as to the content of Wolfe's proffer to Federal law enforcement or how to decipher counsel's notes.

the murder. The jury's rejection of the defense was due to "weaknesses in the facts rather than any inadequacy of counsel." Commonwealth v. Mercado, 383 Mass. 520, 528 (1981), quoting Commonwealth v. Key, 381 Mass. 19, 33 (1980).[20]

6. Posttrial discovery. a. Procedural history. The defendant filed two motions for posttrial discovery and a motion to reconsider the denial of his first posttrial discovery motion, among other motions.[21] In support of those motions, the

---

[20] The defendant also argues that his trial counsel was ineffective in failing to object to the improper lay opinion testimony, to the prosecutor's references to the defendant as "stone cold," and to the judge's instructions on circumstantial evidence. Because we already concluded that these prior allegations of error either did not amount to error or did not create a substantial likelihood of a miscarriage of justice, these claims similarly do not amount to ineffective assistance of counsel. See Commonwealth v. Martinez, 431 Mass. 168, 185 (2000), quoting Commonwealth v. Kosilek, 423 Mass. 449, 457-458 (1996) ("[I]f an error not objected to by trial counsel does not create a substantial likelihood of a miscarriage of justice, . . . a claim of ineffective assistance of counsel with respect to such error will not succeed").

[21] The defendant also filed a motion for a new trial in 2004, which the trial judge denied. In 2018, the defendant included that denial in his motion to reconsider, the subsequent denial of which he appealed. Here, the defendant does not address his 2004 motion for a new trial, nor that aspect of his 2018 motion to reconsider. Pursuant to our § 33E review, we conclude that the trial judge did not err in denying those motions.

We understand that appellate counsel now asserts that the defendant's first version of events concerning the murder was arguably consistent with the FBI report. That version of events, in which Screw was the perpetrator, is different from the defendant's own trial testimony. While this theory may be

defendant primarily relied on three documents:  the FBI report, a 140-page affidavit in support of a Federal search warrant from an unrelated Federal narcotics case (Federal search warrant affidavit), and handwritten notes attributed to Wolfe's attorney (attorney's notes).  As stated supra, the FBI report contained Wolfe's statements to investigators that Screw told Wolfe that Screw had witnessed the defendant kill the victim.  The Federal search warrant affidavit pertained to a Federal narcotics investigation into Wolfe, and while it mentioned Ayah and Screw, it did not mention the murder.  The nearly illegible attorney's notes appeared to state that Screw said Screw killed someone named DJ and that the defendant was with him when that occurred.

In 2004, the defendant moved for posttrial discovery of "any and all [documents] in the possession of the federal authorities" in which Wolfe is mentioned, arguing that the FBI report and the Federal search warrant affidavit demonstrated that the Federal authorities possessed exculpatory evidence. The trial judge denied the motion, concluding that the defendant failed to show that "further discovery or investigation would

---

pursued in a renewed motion for a new trial, trial counsel can hardly be faulted for not pursuing a theory different from his client's sworn testimony, and one emanating from an FBI report where a witness states that the defendant shot the victim.

produce anything helpful for his cause."  The defendant appealed from that denial.[22]

In 2018, the defendant filed a second motion for posttrial discovery requesting from the Commonwealth information and documents pertaining to himself, the FBI report, and Screw, arguing that the Commonwealth either possessed or had access to certain evidence, including exculpatory evidence in the Federal government's possession.  In support of his contentions, the defendant again emphasized the FBI report and the attorney's notes.  In October 2018, a different motion judge denied the defendant's second motion for posttrial discovery, concluding that the information sought would not reasonably uncover evidence warranting a new trial.  The defendant appealed from both denials.

b.  Analysis.  We review the denial of a motion for posttrial discovery for abuse of discretion.  See Commonwealth v. Camacho, 472 Mass. 587, 598 (2015).  To succeed on a posttrial discovery motion, "a defendant must demonstrate that it is reasonably likely that such discovery will lead to evidence possibly warranting a new trial," and "the defendant

---

[22] On June 25, 2018, the defendant filed a motion to reconsider the denial of his 2004 posttrial discovery motion, which the trial judge denied two days later, concluding that the defendant did not raise any new claims that warranted reconsideration.

must make a prima facie showing that the evidence sought would have materially benefited the defense and would have factored into the jury's deliberations."  Id.  "A defendant cannot use a motion for postconviction discovery to engage in a 'fishing expedition.'"  Commonwealth v. Ware, 471 Mass. 85, 94 (2015), quoting E.B. Cypher, Criminal Practice and Procedure § 42:30 (4th ed. 2014).

Neither judge abused his or her discretion in denying the defendant's motions.  The defendant has not alleged any facts amounting to a prima facie showing that the requested evidence would exculpate him.  To the contrary, the documents upon which the defendant relies either inculpate him or do not reference the murder,[23] and are overwhelmingly based on second- or even third-level hearsay.  Moreover, the defendant makes no showing that the Commonwealth has access to any exculpatory Federal documents.  See Ayala, 481 Mass. at 58 (defendant "has not produced any evidence that the redacted portions of the file contained any relevant, let alone exculpatory, information").  In sum, the defendant fails to show that the evidence sought would have "materially benefited the defense and would have

---

[23] In his affidavit, the defendant acknowledged that the Federal search warrant affidavit is devoid of any information pertaining to the murder.

factored into the jury's deliberations."  Camacho, 472 Mass. at 598.

7.  Review under G. L. c. 278, § 33E.  We have reviewed the entire record of this case pursuant to our responsibilities under G. L. c. 278, § 33E.  We conclude that there is no basis for ordering a new trial and affirm the defendant's conviction and the orders denying his postconviction motions.

So ordered.