NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-12670

COMMONWEALTH  vs.  MATTHEW GUMKOWSKI.


Bristol.      January 4, 2021. - May 4, 2021.

Present:  Budd, C.J., Gaziano, Lowy, Wendlandt, & Georges, JJ.


Homicide.  Cellular Telephone.  Practice, Criminal, Motion to
    suppress, Instructions to jury, Capital case.



Indictment found and returned in the Superior Court
Department on August 18, 2011.

A pretrial motion to suppress evidence was heard by Frances
A. McIntyre, J., and the case was tried before Robert J. Kane,
J.


Michael J. Fellows for the defendant.
Stephen C. Nadeau, Jr., Assistant District Attorney, for
the Commonwealth.


LOWY, J.  The defendant, Matthew Gumkowski, was convicted

by a jury of murder in the first degree on a theory of extreme

atrocity or cruelty for the killing of Joseph Kilroy.[1]  The

_____

     [1] The defendant had also been indicted on related charges,
but at trial the Commonwealth proceeded only on the murder
indictment, under theories of extreme atrocity or cruelty,

Commonwealth presented evidence that the defendant robbed the victim, and then beat, strangled, and stabbed him to death. The verdict came in the defendant's second trial, after the first trial ended in a mistrial because the jury were unable to reach a verdict.

In this direct appeal, the defendant argues first that his cell site location information (CSLI)[2] and any "fruits" derived from it should have been suppressed, and second that seven aspects of the jury instructions were erroneous. Discerning no reversible error, we affirm, and we decline to exercise our authority under G. L. c. 278, § 33E.

1. Background. We summarize the evidence at trial, reserving certain details for our analysis of the issues.

The victim was found dead at his Attleboro apartment on July 10, 2011. Sometime between 8:30 P.M. and 9 P.M., the victim's downstairs neighbors heard noises that sounded like furniture being moved about. Shortly after 9 P.M., the smoke alarms sounded. When firefighters arrived minutes later, they

---

felony-murder, and deliberate premeditation. The jury did not convict the defendant on the felony-murder or deliberate premeditation theories.

[2] "Cell[] site location information (CSLI) refers to a cellular telephone service record or records that contain information identifying the base station towers and sectors that receive transmissions from a [cellular] telephone." (quotations and citation omitted). Commonwealth v. Estabrook, 472 Mass. 852, 853 n.2 (2015).

found the victim's body lying on the floor at the foot of the bed.  The fire that had started on the victim's bed was no longer active, the sprinklers were on, and the contents of the room were soaked.  The victim had been beaten, strangled, and stabbed.  A medical examiner testified that, based on the bleeding, the victim was likely alive when he suffered the blunt force injuries, but was already dead or near death when he was stabbed.

Police photographed the room to document its state at the time the body was discovered.  They tested for fingerprints at the scene, and they recovered various objects from inside the apartment for testing, but no usable fingerprints were found, likely because of the sprinklers.

The defendant knew the victim and had bought drugs from him in the past.  In July 2011, the defendant was using approximately a gram of heroin per day.  On the morning of July 10, the defendant visited the victim's apartment, hoping to sell him a ring.  The victim knocked on the door of his neighbor across the hall -- a former jeweler -- and asked him to look at the ring.  When the neighbor looked at the ring, he expressed skepticism about its value.  The neighbor saw another man standing in the victim's apartment; the neighbor described the man as white, with a medium build and blonde hair.  The neighbor later identified the defendant as the man who had been in the

victim's apartment that morning from a photograph shown to him by police.

The defendant's girlfriend testified that in the early evening of July 10, she had been with the defendant in a park in Attleboro, where she had fallen asleep. When she awoke around 8 P.M., the defendant was gone. She called the defendant several times between 8:15 P.M. and 9:09 P.M., including on cell phones borrowed from two strangers. Initially, she did not get an answer, but she eventually spoke to the defendant. She then met up with the defendant shortly after the 9:09 P.M. cell phone call. State police Trooper Daniel Giossi testified that the defendant's cell phone records showed calls taking place from the defendant's cell phone between around 8 P.M. and 9:15 P.M., and the location data showed that the cell phone was in the Attleboro area at the time of the calls.[3]

The defendant was arrested on July 12, 2011, at his girlfriend's mother's house.[4] The defendant became a suspect

---

[3] The parties stipulated that the defendant's cell phone records showed he was within a three-mile radius of the center of downtown Attleboro between 8:13 P.M. and 8:45 P.M. on July 10.

[4] The Commonwealth also introduced evidence showing the defendant's activities between the night of July 10 and his arrest. On July 10 after meeting up at the park, the defendant and his girlfriend traveled to Pawtucket, Rhode Island, where they stayed in a hotel. The next morning, they went to a pawn shop. The defendant went inside while his girlfriend waited outside; when he returned, he had money. The couple then

after law enforcement examined both the victim's and the defendant's cell phone records, as discussed infra.  Before he was taken into custody, police patted him down and found a hypodermic needle in his pocket; testing later revealed traces of heroin.  While the defendant was being booked, an officer noticed spots of blood on the defendant's shoes.  Deoxyribonucleic acid (DNA) testing revealed that the blood matched that of the victim.  Two additional spots of blood found on a T-shirt and pack of cigarettes from the defendants' backpack also matched that of the victim.

After his arrest, the defendant waived his Miranda rights and was interviewed by police.  That interview was recorded, and the recording was entered in evidence.  The defendant initially denied involvement, but he eventually said that he had gone to the victim's apartment on the evening of July 10 to buy heroin.  He told police that two other men were present while he was there.  The first man arrived to sell the victim cigarettes and stayed ten to fifteen minutes.  The defendant described the second man but could not identify him, and said that the second

---

returned to Attleboro, where the girlfriend picked up a check, and the two traveled to Providence, where she cashed the check and gave a portion to the defendant.  That evening, they had dinner with a man they met in Providence and spent the night at the man's home in North Attleboro.  The next morning, all three went to the beach, before traveling back to the girlfriend's mother's home.

man was still at the apartment when the defendant left. The defendant stated that he left the apartment after purchasing drugs. He explained that he had initially lied about visiting the victim because he had been there to purchase drugs, and because he later heard about the fire and homicide from the news.

At trial, the defendant testified and provided a somewhat different account of his time at the victim's apartment. He identified the cigarette seller as a man named Brian Singer. He stated that after Singer had left and while the second, unidentified, man was in the apartment, the victim brandished a knife and provoked a fight with the defendant over money that the defendant owed him. The defendant said he struck the victim several times in the face, and the victim dropped the knife. He then grabbed his backpack and left. The defendant stated that in his initial interview after being arrested, he had lied about getting in a fight because he had seen the news and had heard that there had been a fire and a homicide there.

2. Discussion. a. Motion to suppress. "When reviewing the denial of a motion to suppress, we accept the judge's findings of fact and will not disturb them absent clear error." Commonwealth v. Watson, 455 Mass. 246, 250 (2009). However, we undertake "an independent determination as to the correctness of

the judge's application of constitutional principles to the facts as found."  Id.

The defendant's cell phone records in this case included subscriber information, call logs, and CSLI.[5]  The subscriber information and the call logs are not subject to the warrant requirement under Commonwealth v. Augustine, 467 Mass. 230, 251 (2014), S.C., 470 Mass. 837 and 472 Mass. 448 (2015).  Thus, only the defendant's CSLI is at issue.  The defendant seeks to

---

[5] The motion judge made her decision before we issued our decision in Commonwealth v. Augustine, 467 Mass. 230 (2014), S.C., 470 Mass. 837 and 472 Mass. 448 (2015).  Consequently, the terminology she used to describe the various categories of location data differs from our subsequent decisions defining CSLI, "repoll numbers," and "pings."  See Commonwealth v. Almonor, 482 Mass. 35, 36 n.1 (2019) (pings); Commonwealth v. Collins, 470 Mass. 255, 269 (2014) (repoll numbers); Augustine, supra at 231 n.1 (CSLI).  Thus, we look to the record, and not to the judge's terminology.

The location information included "repoll numbers" as well as "first cell" and "last cell" data.  Trooper Giossi testified that the combination of these three numbers indicates the location of the tower to which a cell phone was connected when it made a call, which shows the cell phone was likely within a three-mile radius of that tower.

In its brief, the Commonwealth initially argued that this information was not CSLI, but merely "repoll numbers," as the motion judge found.  An hour before oral argument, though, the Commonwealth sent an e-mail message to the defense attorney, conceding that this information was actually CSLI.  See Collins, 470 Mass. at 269-270 (repoll numbers only provide location within area of approximately one hundred miles and thus are not comparable to CSLI).  In its postargument brief, the Commonwealth again conceded that the relevant location data was CSLI.

suppress both the CSLI itself, as well as any fruits derived therefrom.

i. <u>Investigation leading to defendant's arrest</u>. We recite the facts the motion judge found following an evidentiary hearing, supplemented with undisputed facts from the record. <u>Commonwealth</u> v. <u>Jones-Pannell</u>, 472 Mass. 429, 431 (2015).

When officers discovered the victim's body at his residence, they also found the victim's cell phone. However, police were unable to extract any information from it because it was soaked. A neighbor provided the victim's cell phone number, and using that, Trooper Giossi obtained the victim's call logs and other information from his service provider, Sprint. In the call logs, Giossi focused on incoming and outgoing calls occurring shortly before 9 P.M., when witnesses reported hearing commotion coming from the victim's apartment. Giossi then made a second request to Sprint for information pertaining to two of those numbers pursuant to the exigent circumstances provision of the Stored Communications Act (SCA), 18 U.S.C. § 2702(c)(4).[6]

---

[6] Specifically, Giossi requested subscriber information and call detail records with cell site information for the past twenty-four hours. To make the request, he called Sprint and requested that someone send him an "exigent circumstance request." He filled out the request and sent it back to Sprint.

The motion judge noted that the information was obtained pursuant to 18 U.S.C. § 2703, but that is inaccurate. Giossi repeatedly referred to making an "exigent circumstance request," which would be under § 2702(c)(4).

One of the numbers was registered to "Matthew Shady" and listed a West Warwick, Rhode Island, address.[7] In addition to that subscriber information, the records showed the dates, times, and durations of incoming and outgoing calls, as well as CSLI. Troopers called the local police department and learned that the West Warwick address was valid and that the resident was the defendant. Local police had previously interacted with the defendant and sent Giossi a photograph of the defendant, as well as incident reports of some of his previous arrests. From these documents, Giossi learned that the defendant was blonde and muscular, and that he matched the description of the man that Singer, a friend of the victim, had seen talking to the victim on the morning of July 10. Giossi examined the defendant's CSLI and determined that it placed his cell phone in the Attleboro area on the evening of July 10.

On July 11, Giossi interviewed Singer, who had gone to the victim's apartment at around 8 P.M. on the day of the murder to sell the victim two packs of cigarettes, and who had stayed for about twenty minutes. While Singer was there, the victim introduced him to a man named "Matt." The man was muscular, with a crew cut, blonde hair, blue eyes, and tattoos. Based on

---

[7] Troopers did not receive any information pertaining to the second number.

this information, law enforcement prepared a photographic array, including the photograph of the defendant that the West Warwick police had sent. From the array, Singer identified the defendant as the blonde man he had seen in the victim's apartment.[8]

Troopers then attempted to locate the defendant. On the defendant's call log, they noticed recent calls to a land line telephone number, and subsequently ascertained the address associated with it. On July 12, Giossi visited that address and spoke with the occupant, Nita Rose. Rose stated that her daughter was dating the defendant, and that the defendant had left some of his property there and likely would return to retrieve it.

Later that day, Rose called the State police to say that she had just heard from her daughter, and that she expected her daughter and the defendant to return to the house shortly. Troopers returned to Rose's address and waited for the defendant to arrive. As soon as he did, officers placed him under arrest.[9]

---

[8] Singer did not testify at trial because officers were unable to locate him. He was last seen in Ohio, but authorities there were unable to locate him. His friends and family indicated that as of the day he went missing, there had been no activity on his bank accounts.

[9] Before apprehending the defendant, investigators also contacted the defendant's cell phone provider, which then initiated a "ping" to ascertain the defendant's location in real time. The motion judge found that that "ping" did not lead to

ii.  CSLI.  Individuals have a reasonable expectation of privacy in their CSLI, and thus the government needs a warrant before searching more than six hours of CSLI data.  See Augustine, 467 Mass. at 255 & n.37.  See also Carpenter v. United States, 138 S. Ct. 2206, 2220 (2018).

Even though the defendant's motion was decided before Augustine, the rule nonetheless applies.  In Augustine, 467 Mass. at 257, we specified that the new rule requiring a warrant for CSLI data applied to "cases in which a defendant's conviction is not final, that is, to cases pending on direct review in which the issue concerning the warrant requirement was raised."  Here, the defendant raised the issue in a motion to suppress before his first trial, and Augustine was decided before his conviction was final.  Thus, the new rule applies retroactively to his case, and a warrant was required for his CSLI data.

Despite this, the Commonwealth argues that a warrant was not required for the defendant's CSLI because the information was turned over pursuant to the voluntary disclosure provision of the SCA (18 U.S.C. § 2702), rather than the mandatory

---

the defendant's arrest; instead, officers located the defendant thanks to their communication with Rose.  The Commonwealth also stipulated that it would not introduce the "ping" evidence at trial.  See Commonwealth v. Almonor, 482 Mass. 35, 36 n.1 (2019) (defining "ping" evidence).

provision analyzed in both <u>Augustine</u> and <u>Carpenter</u> (18 U.S.C. § 2703).[10]  See <u>Augustine</u>, 467 Mass. at 231; <u>Carpenter</u>, 138 S. Ct. at 2212.  This is wrong.

Both art. 14 of the Massachusetts Declaration of Rights and the Fourth Amendment to the United States Constitution apply only to State action.[11]  <u>Commonwealth</u> v. <u>Leone</u>, 386 Mass. 329, 333 (1982).  "Evidence discovered and seized by private parties is admissible without regard to the methods used, unless State officials have instigated or participated in the search"

---

[10] The Stored Communications Act aims to "protect the privacy of users of electronic communications during government investigations" (quotation and citation omitted).  <u>Commonwealth</u> v. <u>Chamberlain</u>, 473 Mass. 653, 658 (2016).  "Service providers are permitted and indeed required to disclose customer records to a 'governmental entity' when that entity has complied with one of the limited number of formal processes for making a demand, such as a warrant, a court order, or an administrative subpoena, as set forth in the act."  <u>Id</u>. at 658-659, citing 18 U.S.C. § 2703(c).

Another section of the statute permits providers to disclose records to the government voluntarily in limited circumstances.  See 18 U.S.C. § 2702(c).  "One such circumstance is when 'the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of information relating to the emergency.'"  <u>Chamberlin</u>, 473 Mass. at 659, citing 18 U.S.C. § 2702(c)(4).

[11] The Commonwealth does not frame its argument in terms of State action, but that is the constitutional question underlying its contention.  The Commonwealth instead based its argument on <u>Chamberlain</u>, 473 Mass. at 658-659, which is inapposite because that case dealt only with statutory rights.

(citation omitted).  Commonwealth v. Brandwein, 435 Mass. 623,
632 (2002).

Here, law enforcement instigated the search when Giossi
contacted Sprint and requested the defendant's cell phone
records.  That he did so using a voluntary disclosure provision
of the SCA, rather than a mandatory disclosure provision, does
not require a different conclusion.  In either instance, if law
enforcement instigates the search by contacting the cell phone
company to request information, there is State action.[12]  That
Sprint could have refused to provide records in response to
Giossi's request does not change the fact that he instigated the
search.  See Brandwein, 435 Mass. at 632.

Because law enforcement infringed upon the defendant's
reasonable expectation of privacy in his CSLI without a warrant,
the CSLI should have been suppressed.

iii.  Harmless error.  Next, we determine whether the
admission of defendant's CSLI data was harmless.[13]  Because the

---

[12] In Augustine, 467 Mass. at 240-241, we noted that one
factor showing State action was that the search was compelled by
the Commonwealth's subpoena.  Yet this did not change our test
for State action from Brandwein, 435 Mass. at 632.  Further,
although decided under the Fourth Amendment, Carpenter 138 S.
Ct. at 2213-2214, implicitly held that there was State action,
and the fact that police officers there used a mandatory
subpoena did not factor into the United States Supreme Court's
analysis.

[13] The Commonwealth did not argue harmless error in its
original brief; instead, it raised the issue for the first time

defendant moved to suppress this evidence before trial, we review the admission of the CSLI to determine whether it was harmless beyond a reasonable doubt.  Commonwealth v. Tavares, 482 Mass. 694, 709 (2019).

Our review under this standard considers a number of factors, including

> "[1] the importance of the evidence in the prosecution's case; [2] the relationship between the evidence and the premise of the defense; [3] who introduced the issue at trial; [4] the frequency of the reference; [5] whether the erroneously admitted evidence was merely cumulative of properly admitted evidence; [6] the availability or effect of curative instructions; and [7] the weight or quantum of evidence of guilt."

Commonwealth v. Seino, 479 Mass. 463, 467-468 (2018), quoting Commonwealth v. Dagraca, 447 Mass. 546, 553 (2006).  We then must decide, based "on the totality of the record before us, weighing the properly admitted and the improperly admitted evidence together, [whether] we are satisfied beyond a reasonable doubt that the tainted evidence did not have an effect on the jury and did not contribute to the jury's verdicts."  Commonwealth v. Tyree, 455 Mass. 676, 701 (2010).

---

at oral argument, and then submitted a postargument letter.  The defendant argues that it is the Commonwealth's burden to prove harmlessness and that the Commonwealth waived the issue by not arguing it in its brief.  Recognizing the unusual nature of the situation -- where the Commonwealth conceded that the data was CSLI the morning of oral argument -- we ordered postargument briefing on the issue of harmless error.  Because the defendant has now had an opportunity to respond, we consider the issue.

We hold that the introduction of the defendant's CSLI data was harmless. First, it was cumulative of other evidence. The Commonwealth introduced the CSLI in the form of a stipulation, stating that the defendant's cell phone was located within a three-mile radius of downtown Attleboro between 8:13 P.M. and 8:45 P.M. on July 10. This was cumulative of the defendant's videotaped police station interview, where he stated that he went to the victim's Attleboro home on the evening of July 10. Moreover, the defendant's girlfriend testified that she was with the defendant in Attleboro before and after the time of the murder. Thus, the CSLI only corroborated other undisputed evidence that the defendant was in Attleboro at around the time of the murder. See Commonwealth v. Vazquez, 478 Mass. 443, 446 (2017) ("The CSLI evidence corroborated the Commonwealth's other, very strong evidence of guilt by confirming . . . that the defendant was in fact in the area of the crime at the time of the shooting").

Second, the prosecutor did not mention the CSLI with any frequency. In closing argument, the prosecutor stated that the defendant's cell phone records showed he was in the victim's room at the time of the murder, but it appears he was referring to the call logs, not the CSLI, because he proceeded to reference the girlfriend's calls to the defendant, and the defendant's statement that he had been at the victim's apartment

when he received one of them.  The CSLI itself was never referred to in closing.

Finally, the other evidence of guilt was substantial.  The defendant admitted to being in the victim's room on the night of the murder.  When he was arrested two days later, police found blood with DNA matching the victim's on his shoe as well as items in his backpack.  Thus, we are convinced beyond a reasonable doubt that the CSLI data "did not have an effect on the jury and did not contribute to the jury's verdicts."  Tyree, 455 Mass. at 701.[14]

iv.  Fruits.  Next, the defendant argues that not only should the CSLI have been suppressed, but so should any fruits derived from it.  He argues that both the call logs and the evidence seized during his arrest are tainted by the unlawfully obtained CSLI data, thus constituting fruits of the poisonous tree.  See Wong Sun v. United States, 371 U.S. 471, 484 (1963).  Because neither of these categories of evidence was derived from the CSLI, they are not fruits.

---

[14] The Commonwealth also argued at oral argument -- despite not having briefed the issue -- that the CSLI should not be suppressed because we should apply the "good faith" exception to the exclusionary rule, which we have not recognized in the Commonwealth.  See Commonwealth v. Fredericq, 482 Mass. 70, 84 (2019).  Because we find the error was harmless, we need not address that argument.

"Under what has become known as the 'fruit of the poisonous tree' doctrine, the exclusionary rule bars the use of evidence derived from an unconstitutional search or seizure." Tavares, 482 Mass. at 706, quoting Commonwealth v. Fredericq, 482 Mass. 70, 78 (2019). "In determining whether the evidence is considered a fruit of the poisonous tree, we consider 'whether . . . the evidence . . . has been come at by exploitation of [that] illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" Tavares, supra, quoting Fredericq, supra.

First, the call logs were not fruits of the CSLI.[15] The Commonwealth received the call logs and the CSLI as a result of the same request.[16] The mere fact that the call logs were requested contemporaneously and were produced on the same sheet of paper as the CSLI does not render them a fruit; the logs were not derived from the CSLI or obtained as a result of a CSLI request. See Tavares, 482 Mass. at 706.[17]

---

[15] The call logs included incoming and outgoing calls, the times and dates of those calls, and the duration of each call. As discussed supra, the call logs are not subject to the warrant requirement under Augustine, 467 Mass at 251.

[16] At the suppression hearing, Giossi testified that he asked for the subscriber information and call detail records with CSLI in the same request. Call detail records include both call logs and CSLI.

[17] The defendant argues that this reasoning renders the exclusionary rule toothless because it does not disincentivize

Second, the defendant's arrest -- and the clothing seized from him postarrest -- are also not fruits of the CSLI. The defendant became a suspect not as a result of his CSLI, but through information garnered from his call logs and subscriber information. Police began investigating the defendant because his cell phone number was one of two numbers that had been in contact with the victim's cell phone shortly before the victim's death. Police then requested the defendant's cell phone records from Sprint. The defendant's subscriber information showed his cell phone was registered to an address in West Warwick, Rhode Island. The investigators then called the West Warwick police department and learned that the defendant was blonde with blue eyes and a muscular build -- matching the description of both the man whom the victim's neighbor saw discussing a ring that morning and the man whom Singer saw in the victim's apartment around 8 P.M. on the night of the murder. Police used a photograph of the defendant sent by West Warwick police to conduct a photographic array with Singer, who identified the

---

police from securing and using CSLI without a warrant. On the contrary, if police unlawfully obtain CSLI, any fruits derived therefrom must be suppressed unless the Commonwealth proves that the evidence is untainted. See Commonwealth v. Blevines, 438 Mass. 604, 610-611 (2003). The fact that the call logs were not derived from the CSLI, and thus are not a fruit, does not gut the exclusionary rule. Rather, that is simply how the rule works.

defendant as the blonde male he had seen talking to the victim shortly before his death.[18]

Police did also look at the defendant's CSLI. It showed that he had been within three miles of Attleboro around the time of the murder. Yet the CSLI was merely "cumulative and corroborative" of other evidence, and thus did not lead to the defendant becoming a suspect. Vazquez, 478 Mass. at 446.

Finally, the defendant was located and arrested through, as the motion judge put it, "traditional investigative techniques," not through the CSLI. To locate the defendant, police started by contacting the telephone numbers on the victim's call log. They noticed a land line telephone number, figured out its location, and visited it. There they found Rose, the defendant's girlfriend's mother. Rose stated that the defendant had left some of his belongings in her home, and that she expected him to return. Later that day, Rose called one of the officers, stating that her daughter and the defendant had just called and that they would be returning to the house soon. Police went to Rose's house. When the defendant arrived, they placed him under arrest.[19] Thus, the apprehension and arrest of

---

[18] The neighbor also identified the defendant from a photographic array, although that evidence was not introduced at the suppression hearing.

[19] Other officers who did not testify at the suppression hearing contacted Sprint to request a "ping" of the defendant's cell phone to attempt to locate him prior to his arrest. But,

the defendant was also not a fruit of any unlawfully obtained evidence, and therefore evidence obtained as a result should not be suppressed.

b. _Jury instructions_. Next, the defendant argues that his counsel was ineffective for failing to object to seven portions of the jury instructions, and that the failure to object created a substantial likelihood of a miscarriage of justice. We disagree.

"Because the defendant was convicted of murder in the first degree, rather than evaluating claims of ineffective assistance under the traditional standard of Commonwealth v. Saferian, 366 Mass. 89, 96 (1974), we apply instead the more favorable standard of G. L. c. 278, § 33E, to determine whether there was a substantial likelihood of a miscarriage of justice" (footnote omitted). Seino, 479 Mass. at 472 , citing Commonwealth v. Wright, 411 Mass. 678, 681-682 (1992), S.C., 469 Mass. 447 (2014). "That is, we determine whether defense counsel erred in the course of the trial and, if so, 'whether that error was likely to have influenced the jury's conclusion.'" Seino, supra at 472-473, quoting Wright, supra at 682.

---

as the motion judge found, the pings were "not material in his arrest in that he was apprehended through traditional investigative measures."

"When evaluating jury instructions, we consider the charge in its entirety, to determine the probable impact, appraised realistically . . . upon the jury's factfinding function" (quotation and citation omitted). Commonwealth v. Walker, 466 Mass. 268, 284 (2013). "Jury instructions must be construed as a whole to prevent isolated misstatements or omissions from constituting reversible error." Id., citing Commonwealth v. Owens, 414 Mass. 595, 607 (1993). We examine each portion of the jury instructions in turn.

i. Factual questions. First, the defendant argues that the following instruction asked the jury to find facts that were immaterial to any element of the crime and placed a burden on the defendant to prove that someone else had killed the victim:

> "Now, I say this to you. You're charged with finding the facts. It's your job. I have nothing to do with it. To find the facts. In this case, you are being asked to determine what happened at Apartment 9 located at 49 Dunham Street in Attleboro during the evening hours of July the 10th, 2011. That inquiry by this jury presents, among others, the following examinations. One, who was there that night? Two, when did each party arrive? Three, what was each party's purpose in going to that apartment that night? Four, what did each party do? And five, what was the sequence of events? And I'm going to repeat those. Who was there that night? When did each party arrive? What was each party's purpose in going to Room No. 9 at 49 Dunham Street? What did each party do inside that room? What was the sequence of events?"

The defendant likens this instruction to the one reviewed in Bihn v. United States, 328 U.S. 633 (1946). There, multiple defendants were tried for conspiracy, and a crucial issue for

one of the defendants was whether she stole ration coupons from a bank.  Id. at 634-635.  The judge instructed the jury:

> "Who would have a motive to steal them?  Did she take these stamps?  You have a right to consider that.  She is not charged with stealing, but with conspiracy to do all these things, and you have a right to consider whether she did steal them, on the question of intent.  Did she steal them?  Who did if she didn't?  You are to decide that."

Id. at 636-637.  The United States Supreme Court held that with respect to the defendant in question, the charge was prejudicial error, because it essentially shifted the burden of proof to the defendant by "putting on [the defendant] the burden proving her innocence by proving the identity of some other person as the thief" (citation omitted).  Id. at 637.

Although the judge's instruction here was ill advised, trial counsel's failure to object did not create a substantial likelihood of a miscarriage of justice.  Looking at the instructions as a whole, we do not believe it would have substantially affected the jury's function as the sole finder of the facts.  See Walker, 466 Mass. at 284.  First, the judge began the instruction by reiterating that he had no role in finding the facts; that was the sole province of the jury.  This harkened back to one of his initial instructions, where he stated, "I'm going to bring up suggestions.  Not requirements." Further, while the instruction posed factual questions to the jury that were tangential to finding the elements of the crime,

unlike in <u>Bihn</u>, the judge did not require the jury to find these tangential facts.

ii. <u>Bias</u>. Second, the defendant argues that the judge undermined the defendant's credibility by instructing the jury that he "has a bias." The comment came at the end of the judge's general instructions regarding credibility:

> "Credibility, jurors. What do we mean by that? You know about it. Sure, you do. You use it in your everyday affairs. Think about this. Do people come up to you and tell you to believe something? Ask you to say yes? And it's something that you want to think about. What do you do? What's the first thing? Well, you're watching the person. Sure, you are. You want to figure out from your common sense whether or not this person is believable. So you're watching demeanor. You're also listening carefully to the words and asking yourself he just said that, but then he said this, and those two don't make sense. If he said this, then that doesn't follow. You're listening to him to see whether this is double talk, or sales talk, or this is the genuine article. Three, you're thinking what's in it for him or her. Is there bias? Is there self interest? All of that comes into play. So you are in a sense evaluating all the time in your lives believability. And I say to you that you're going to use essentially those same tools when you go into that jury room, and you use your common sense and life's experiences to decide this.

> "You're going to be asking about consistency. You're going to ask yourself about coherency. Does it appeal to common sense and logic? And you're going to ask yourself about how it was presented, and you will also ask yourself about bias or interest. And bear this in mind. The defendant has a bias. He has an interest. So do the police. So do the police. Anyone who works for an agency that's involved in the case has a bias. So don't think the only person with a bias is the defendant, because that's not so."

> "It is appropriate for a judge to mention that interest in

the case is a criterion, along with others which the judge

detailed, for assessing the credibility of witnesses." Commonwealth v. Ramos, 31 Mass. App. Ct. 362, 368 (1991), citing Commonwealth v. Perez, 390 Mass. 308, 320 (1983). In Perez, supra at 314 n.3, the judge instructed the jury, "You are entitled to weigh this evidence, this testimony of the defendant, and you are entitled, of course, in weighing the testimony of the defendant, to consider, if you see fit, the interest of the defendant in the outcome of the case which is before you." We held that "[w]hile it is not a model charge, we conclude that the judge did not impose on the jury his opinion of the witness's credibility." Id. at 321.

The same is true here. While the judge should not have stated "the defendant has a bias," taken in context the comment did not communicate to the jury the judge's own opinion regarding the defendant's credibility. See Perez, 390 Mass. at 321. Rather, it was immediately followed with the reminder, stated and then repeated, that the police, too, have a bias, as does anyone who works for an agency involved in the case. Thus, even though the defendant's potential bias should not have specifically been mentioned, this is not a case where his bias was "singled out for special comment." United States v. Rollins, 784 F.2d 35, 37 (1st Cir. 1986). Thus, trial counsel's failure to object did not amount to a substantial likelihood of

a miscarriage of justice.[20]  We emphasize, however, that the utmost care is required when instructing the jury about a defendant's testimony or failure to testify.  Even an unintended suggestion by the judge that the defendant's testimony is subject to greater scrutiny risks error.

    iii.  <u>Contradiction between an exhibit and a witness</u>.  Third, the defendant argues that the judge invaded the fact-finding province of the jury by instructing them that if an exhibit contradicted a witness, the jury should use the exhibit as "[a] reason not to believe a witness."  The instruction was as follows:

> "Now, there's another way to look at credibility.  Say to yourself, you know, I believe something in those exhibits. And you know what?  What's in those exhibits backs up this witness.  That's called corroboration.  If, on the other hand, the exhibit contradicts the witness, what do you use that for?  A reason not to believe a witness.  And go back to this, jurors.  If someone's being sincere with you, you move onto reliability.  If someone's insincere and is winking at the oath, how can you believe that person?  So

---

[20] The defendant also argues that the judge did not inform the jury to what extent the defendant's potential bias may have influenced his credibility.  See <u>United States</u> v. <u>Gleason</u>, 616 F.2d 2, 15 (2nd Cir. 1979) ("Where the court points out that testimony of certain types of witnesses may be suspect . . . it must also direct the jury's attention to the fact that it may well find these witnesses to be truthful").  While again it would have been preferable for the judge to state as much explicitly, he did, in his illustration about how one evaluates credibility in one's everyday life, state, "you're thinking what's in it for him or her.  Is there bias?  Is there self interest?  All of that comes into play."  This comment showed that bias is but one of many factors to be evaluated in determining credibility, in addition to, among others, the person's demeanor and word choice.

that is what I would say as to your consideration of credibility."

The defendant argues that this instruction "improperly informed the jury precisely what effect certain evidence should have on their deliberations" and was particularly prejudicial because the Commonwealth had argued in closing that the jury should not believe the defendant's testimony, and look instead to statements the defendant made in his recorded interview. Thus, the defendant argues the instruction mirrored the Commonwealth's theory of the case.

We disagree. The judge did not state that exhibits should be believed over witness testimony, but rather any contradictions could be considered when assessing witness credibility. Moreover, the judge had previously instructed the jury that they had "full authority over the evidence," including whether to believe or disbelieve some or all of a witness's testimony. Thus, in the context of the instructions as a whole, counsel's failure to object to this instruction did not create a substantial likelihood of a miscarriage of justice.

iv. Jurors should be "controlled" by the video recording of the defendant's statement to police. Fourth, the defendant argues that the judge again invaded the fact-finding province of the jury when he instructed:

"You've got a video, jurors. You've got a video of what the interview consisted of at the Attleboro police station.

That's going to be given to you. You're going to have the ability to play it. Indeed, you should be controlled by it. What he said on the video, you're going to see. You're going to see it. If it conflicts with what the lawyers said he said, you're going to follow the video."

The defendant argues that this instruction, like the previous one, communicated to jurors that they should give greater weight to the defendant's recorded statements to police than to his testimony at trial. The defendant acknowledges that the last sentence asks jurors to contrast the video recording with statements by lawyers -- which are not evidence -- and states that the video evidence should control over what lawyers said about the recording. The defendant nonetheless argues that jurors could understand the instruction to mean instead that the recording should control "over other evidence and testimony and over any misstatements made by the lawyers."

We disagree. The instruction clearly refers only to comparing the recording to the lawyer's statements, not to comparing the recording to other evidence. While it would have been prudent for the judge to say that all the evidence -- not just the video recording -- controls over statements by the attorneys, the instruction was not error. In the context of the instructions as a whole, a reasonable juror would have understood this instruction as referring back to an instruction the judge had given before closing arguments: that lawyers are not witnesses and cannot provide information that is not found

directly or inferentially in the evidence.  Thus, the instruction was not error, and consequently trial counsel was not ineffective for failing to object.

v.  <u>Direct and circumstantial evidence</u>.  Fifth, the defendant argues that the judge's instruction on the difference between direct and circumstantial evidence essentially diminished the Commonwealth's burden of proof.  Specifically, the judge illustrated the concepts of direct and circumstantial evidence by giving two hypothetical examples.  In the first -- which illustrated direct evidence -- the judge described a defendant who was charged with leaving the scene of an accident. In the example, a victim felt something strike her car, which caused her to hit a tree.  Two days later, a witness told police that on the night in question he had been a passenger in a car when the driver started to text, struck a car that struck a tree, and then drove off.  The witness identified the victim's car as the one that had been struck by the defendant's vehicle. The judge described the witness's testimony as direct evidence.

In the second example, which illustrated circumstantial evidence, the judge used the same hypothetical, but instead of a witness who saw the accident, the evidence came from various other sources.  A neighbor who heard the crash stated she saw a dark Ford Taurus with a license plate starting with "1-0" leave the scene.  The police then searched Registry of Motor Vehicle

records to identify owners of dark Ford Tauruses with license plates starting with 1-0, and found the defendant. The location of the car crash was consistent with the most efficient route of travel to the defendant's home. When police visited the defendant's home, they found a Taurus with damage consistent with the accident. Paint chips on the Taurus were consistent with the paint from the victim's car. The defendant admitted to driving his Taurus the night of the accident, but denied striking a car.

The defendant first argues that the charge was unbalanced because it only illustrated how to infer guilt and not how to infer innocence. See United States v. Dove, 916 F.2d 41, 46 (2nd Cir. 1990) (to explain difference between direct and circumstantial evidence, trial judge used unbalanced hypothetical that "merely instructed how to look for evidence of . . . guilt"). We recently analyzed a similar hypothetical by the same trial judge in Commonwealth v. Silva, 482 Mass. 275, 286-290 (2019). There, although we did not explicitly address the unbalanced nature of the charge, we held that, taken as a whole, the instructions were not error; however, we "underscore[d] that, moving forward, . . . it is better practice to avoid examples in which hypothetical individuals commit crimes." Id. at 290. We hold the same here. See United States v. Hensley, 982 F.3d 1147, 1161 (8th Cir. 2020) (unbalanced

hypothetical was not error but "discourag[ing] the use of such one-sided jury instructions"); United States v. Salameh, 152 F.3d 88, 142-143 (2d Cir. 1998), cert. denied, 526 U.S. 1028 (1999) (noting unbalanced hypotheticals are "disfavored" but did not constitute prejudicial error in circumstances, because most circumstantial evidence in case pointed towards guilt).

Next, the defendant argues that the hypothetical describes a situation similar to the facts at trial and thus acted as a roadmap showing how to find the defendant guilty. This argument was not raised in Silva because the facts from the hypothetical used there did not mirror those of the case. Here, we are troubled that the hypothetical too closely tracks the facts of the defendant's case.

To illustrate this, we compare the two. The neighbor who witnessed a Ford Taurus leaving the scene is akin to the neighbor who saw Gumkowski[21] in Kilroy's apartment the day of the murder. Investigators visiting the home and finding the defendant is akin to investigators arresting Gumkowski at Rose's home. The paint chip on the Taurus consistent with paint from the victim's car is akin to the blood on Gumkowski's shoe that was consistent with Kilroy's DNA. The defendant admitting to driving the Taurus on the night of the accident but denying

---

[21] Here we refer to Gumkowski by name to distinguish him from the defendant in the judge's hypothetical.

striking the car is akin to Gumkowski admitting to going to Kilrow's apartment on the night of the murder but denying committing it.

The hypothetical used in this case is far more similar to the facts of the defendant's case than instructions that have been objected to on similar grounds. Compare Commonwealth v. Shea, 398 Mass. 264, 270 & n.3 (1986) (rejecting defendant's argument that hypothetical about missing piece of chocolate cake too closely paralleled facts of his case); Commonwealth v. Gil, 393 Mass. 204, 222 (1984) ("We do not think that the coincidental similarity between the well-known 'footprints in the snow' example and the evidence of footprints on the floor at the scene of the crime would make the jury reasonably believe that the judge was expressing his belief in the Commonwealth's theory of the case or was favoring a particular inference propounded by the prosecutor"); Commonwealth v. Vaughn, 32 Mass. App. Ct. 435, 443 (1992) ("Although we do not think the judge committed reversible error, the similarity of the analogy to the Commonwealth's evidence makes use of that particular analogy ill-advised in the instant circumstances of this case" [citation omitted]); Hensley, 982 F.3d at 1161 (very short hypothetical illustrating concept of substantial step "track[ed] closely with the facts of [the] defendant's case"); Dove, 916 F.2d at 46

(hypothetical about "whether Jack shot Mary" was "not analogous to the facts of this case").

In those cases, the illustrations were less in depth than the hypothetical used here.  Here, the hypothetical closely mirrored the circumstances of the defendant's case and arguably served to emphasize the prosecution's theory of the case, illustrating to the jurors how they could find the defendant guilty.  Thus, the instruction was erroneous.  Consequently, trial counsel was ineffective for failing to object.

Looking at the instructions as a whole, however, the error did not create a substantial likelihood of a miscarriage of justice.  First, as in Silva, 482 Mass. at 289, the judge made clear that the jury could not premise a verdict on speculative inferences.[22]  Second, the judge stated that jurors should not take anything he had said to demonstrate his view on the case, and that if he had done so unintentionally, they should disregard it.[23]  See Hensley, 982 F.3d at 1160-1161 (judge's use

---

[22] Specifically, the judge stated:  "One, you can only draw a reasonable inference from evidence that you believe.  Two, that inference has to be reasonable.  In other words, it can't be a guess."

[23] The judge instructed:  "Jurors, I am neutral in this case.  I have no role in the facts.  And if I ever suggested to you that I have a view of this case, that's arrogant on my part. That is not something I want to convey.  I respect you; and if I did that unconsciously, you disregard it."

of hypothetical similar to facts case not reversible error because judge also instructed that jury "should not take anything I have said or done during the trial as indicating what I think of the evidence or what I think your verdict should be"). Third, the hypothetical did not infringe on the instructions on reasonable doubt. Compare Silva, supra (judge's hypothetical to explain circumstantial evidence entirely separate from "unambiguous and adequate instruction on reasonable doubt"), with Commonwealth v. Pomerleau, 10 Mass. App. Ct. 208, 214 (1980) (use of examples to explain reasonable doubt was reversible error). Fourth, it is clear from a review of the entire record that the judge was scrupulously focused on the defendant receiving a fair trial. And finally, the Commonwealth's case against the defendant was strong, and thus any error was likely not to have influenced the jury's verdict. Cf. Commonwealth v. Garcia, 379 Mass. 422, 442 (1980) (error in jury instructions was harmless where "case involve[d] overwhelming evidence of guilt").[24] In sum, although the

---

[24] In Silva, 482 Mass. at 288, an additional mitigating factor was that the jury did not convict on a theory of deliberate premeditation, which showed "they understood the high degree of certainty required to find the defendant guilty." While here, similarly, the jury did not convict on either deliberate premeditation or felony murder, we do not believe this fact mitigates the error in the jury instructions. The erroneous hypothetical did not speak to the hypothetical defendant's intent or any underlying felony, so there is no

instruction -- and counsel's subsequent failure to object -- were error, those errors did not create a substantial likelihood of a miscarriage of justice.

vi. Reasonable inferences. Sixth, the defendant argues that at the close of the hypothetical illustrating circumstantial evidence, the judge insinuated an inference of guilt would be reasonable. At the close of the hypothetical, the judge stated: "And in this instance, you could be asked do you draw a reasonable inference that the defendant [in the hypothetical] did this. And in looking at that question, you certainly can apply your common sense, your powers of logic."

The defendant argues that a juror would likely understand this instruction as implying that any inference they might draw of the defendant's guilt would be a reasonable one. Although we have made our concerns with the hypothetical clear, we do not think this closing element created a substantial likelihood of a miscarriage of justice. While the words may have subtly implied that such an inference would be reasonable, a reasonable jury would not have interpreted them as "a conclusive direction by [the judge] to find murder in the first degree once the jury were convinced of the [underlying] facts." Commonwealth v. Skinner, 408 Mass. 88, 95 (1990). Compare id. at 94-95

_____

reason it would have affected the jury's fact finding concerning the elements of deliberate premeditation or felony-murder.

(reversible error where judge instructed "not only that [the jury] <u>could</u> infer premeditation from certain subsidiary facts and malice, but that the finding of those facts and malice '<u>would</u> constitute first-degree murder'").

    vii.  <u>Drawing of inferences</u>.  Seventh, the defendant argues that the judge's instructions on inferences implied that intent had to be proved beyond a reasonable doubt, but the other elements of the crime did not.  The judge instructed:

> "And here are the rules that apply to drawing a reasonable inference.  One, you can only draw a reasonable inference from evidence that you believe.  Two, that inference has to be reasonable.  In other words, it can't be a guess. Three, that where the inference constitutes an element of the crime -- intent.  Intent, which I told you can well be the subject of circumstantial evidence -- it has to be proven beyond a reasonable doubt."

Looking at the jury instructions as a whole, it is clear that the judge properly instructed the fact that proof beyond a reasonable doubt is necessary for every element of the offense. As the judge outlined the elements of each charged crime, he repeatedly emphasized that the Commonwealth had the burden to prove each element beyond a reasonable doubt.  Thus, a reasonable juror would have understood the challenged instruction to show that intent is one example of an element that must be proved beyond a reasonable doubt, not that it was the only one.  There was no error.

c. Relief pursuant to G. L. c. 278, § 33E. We have reviewed the record in accordance with our statutory duty under G. L. c. 278, § 33E, and we identify no basis upon which to order a new trial or to reduce the degree of guilt.

Judgment affirmed.